ORDERED.

Dated:  October 14, 2025

_____
Catherine Peek McEwen
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:

Calvin Godwin,

        Debtor.
_____/

Case No. 8:20-bk-04446-CPM
Chapter 7

Scott Thrower, Carolina
Electrical Workers Retirement
Fund, National Electrical Benefit
Fund and Family Medical Care Plan,

        Plaintiffs,
v.

Calvin Godwin,

        Defendant.
_____/

Adv. No. 8:20-ap-00418-CPM

**MEMORANDUM OPINION FOLLOWING TRIAL ON
 COMPLAINT TO DETERMINE NONDISCHARGEABILITY OF DEBT**

      Unlike a typical sports competition, there is no opportunity for a draw in litigation, even if given an extra chance in overtime.  A "tie" in court actually means a loss for the party that bears the burden of proof, as the Plaintiffs did in the trial of this adversary proceeding for a determination of the dischargeability of a debt.  The standard of proof to be applied in a

dischargeability proceeding such as this is the preponderance of the evidence standard, which required the Plaintiffs to provide a quantum of evidence sufficient to persuade the Court that their claim of nondischargeability is more likely true than not.[1]  A common description of the preponderance of the evidence standard is that the bearer of the burden must tip the scales of justice at least somewhat so that the scales do not hang in equilibrium.  After being given the opportunity for a trial of the proceeding following a remand after appeal of this Court's summary judgment in favor of the Defendant-Debtor (thus the overtime reference), the Plaintiffs did not tip the scales, not even ever so slightly.  The evidence ended in equilibrium, meaning a tie.

In this dischargeability proceeding, the Plaintiffs allege that the debt owed by the Defendant should not be discharged because the debt arose out of the Defendant's defalcation while acting in a fiduciary capacity concerning certain employee benefit pension funds whose beneficiaries are electrical union members.  Accordingly, the Plaintiffs seek entry of a judgment declaring the debt nondischargeable under 11 U.S.C. § 523(a)(4), one of the Bankruptcy Code's many exceptions to a discharge in bankruptcy.[2]  For the reasons explained more fully below, the Court finds and concludes that the Plaintiffs have failed to prove that the Defendant committed defalcation under § 523(a)(4).

## **Preamble**

At trial, the Court had to determine whether the Defendant is the proverbial "honest but unfortunate debtor."  The Bankruptcy Code provides a judicially supervised process that enables debtors to "reorder their affairs, make peace with their creditors, and enjoy a new

---

[1] *Grogan v. Garner*, 498 U.S. 279, 290 (1991).
[2] 11 U.S.C. § 523(a)(4) ("A discharge under section ... 727 ... does not discharge an individual debtor from any debt ... (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; . . . . ).

opportunity in life with a clear field for future effort."[3] This "fresh start" policy, however, is available only to the "honest but unfortunate debtor."[4] Dishonest debtors cannot use the Bankruptcy Code's discharge to avoid the consequences of their own misconduct.[5]

The Supreme Court has instructed that exceptions to discharge "should be confined to those plainly expressed."[6] The United States Court of Appeals for the Eleventh Circuit has held that exceptions to the general rule of discharge are to be strictly construed in favor of the debtor.[7] However, such deference to the "fresh start" policy is contrary to the Supreme Court's clear instruction to confine discharge exceptions to those plainly expressed.[8] Therefore, this decision does not turn on construing the facts in a light most favorable to the Defendant and the "fresh start" policy of the Code; rather, it turns on the Plaintiffs' failure to meet their burden of proof.

## I. Chronology of Underlying Facts

### A. Collective Bargaining Agreement with the International Brotherhood of Electrical Workers

Global Team Electric, LLC ("GTE"), an electric company, was formed on January 1, 2017, by Calvin Godwin ("Godwin"), the Defendant, and Darmell Lee ("Lee"). On April 17, 2017, Godwin and Lee signed letters of assent to collective bargaining agreements ("CBAs") with two electrical worker unions—the International Brotherhood of Electrical Workers Local ("IBEW") 379 and 80.[9] Lee signed the letter of assent for Local 379, and Godwin signed the

---

[3] *Beem v. Ferguson*, 713 Fed. App'x 974, 977 (11th Cir. 2018) (citations omitted).
[4] *United States v. Mitchell* (*In re Mitchell*), 633 F.3d 1319, 1326 (11th Cir. 2011).
[5] *Grogan,* 498 U.S. at 286-87 ("[T]he Act limits the opportunity for a completely unencumbered new beginning to the honest but unfortunate debtor.") (internal quotation omitted).
[6] *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 268 (2013) (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998)).
[7] *Mitchell*, 633 F.3d at 1327.
[8] *Schwab v. Reilly*, 560 U.S. 770, 790 n.17 (2010) (quoting *Kawaauhau*, 523 U.S. at 62) (describing narrow construction as "missing the mark"). *See also* Jonathon S. Byington, *The Fresh Start Canon*, 69 Fla. L. Rev. 115 (2017).
[9] Plaintiff's Ex. 13 (Doc. 164-13).

letter for Local 80.[10] The CBAs covered all of GTE's employees that performed electrical work within the geographic jurisdiction of the local union and obligated GTE to contribute to the Plaintiffs' employee benefit plans or funds, which provide pension and healthcare for the union members who performed work for GTE.[11] Under the CBAs, GTE was also bound by the Amended Restated Employees Benefit Agreement and Declaration of Trust ("the Trust Agreement") which stated that "[c]ontributions made or required to be made pursuant to [the CBA] shall be deemed part of the Trust estate and shall constitute Trust Assets whether or not they are collected."[12] The Plaintiffs in this proceeding are Scott Thrower ("Thrower"), as representative of three employee benefit funds, as well as the three benefit funds themselves.

Godwin and Lee met with Thrower, the business manager for IBEW Local 5 Union 379 in Charlotte, North Carolina, to sign the letters of assent to the CBAs.[13] During the meeting, Thrower discussed the ins and outs of being a contractor with Lee and Godwin. Specifically, Thrower testified at trial that:

> The subjects [discussed at the meeting] were, and we discuss this with all people who want to be a union contractor, how to request manpower, that procedure, the contract itself, the wages, the benefits, and conditions that they would be subject to when signing. The most important thing that I always go over are how the benefits are paid, the process in which that happens, and basically how the contract works, how you can get out of the contract, [and] how you enter the contract. Those were the main subjects that we discussed.[14]

However, Thrower also testified that Godwin arrived late to the meeting with Thrower and Lee. Therefore, the record is clear that Godwin did not overhear the entirety of this discussion.[15]

---

[10] *Id.*
[11] *Id.*
[12] Campbell Aff., Ex. C. (Doc. 64).
[13] Trial Tr. Vol. 1, 56:14-24 (Doc. 174).
[14] Trial Tr. Vol. 1, 58:13-21.
[15] Trial Tr. Vol. 1, 77:21-22.

Further, Thrower conceded that he never used the word "fiduciary" during the meeting, nor did he explain that GTE's income becomes an asset of the benefit funds.[16]

### B. *GTE's Failure to Make Payments Owed to IBEW Local 379's Benefit Funds*

In the Fall of 2019, GTE failed to make several payments to the benefit funds as required by the CBA with IBEW Local 379.[17] Toward the end of March in 2020, Godwin received a call from a bonding agent who informed him that GTE's workers were not at their jobsite.[18] Godwin contacted the general contractor ("GC"), who informed him that Lee pulled the workers off the jobsite due to COVID.[19] Godwin testified that he was not able to get in contact with Lee for almost a week after his conversation with the general contractor.[20] Godwin eventually got in contact with Lee through the bonding agent, and they agreed that the workers would be sent back out to the jobsite. However, Lee needed money in GTE's account to do so.[21] In an effort to get the workers back on the jobsite, Godwin returned money to GTE's account that he previously paid to himself to catch up on his overdue salary.[22] However, the next week, when the workers arrived at the jobsite, they picked up their tools and did not resume work as agreed.[23]

On March 27, 2020, Lee initiated a payment of $106,387.58 to IBEW Local 379's benefit funds for a portion of past due contributions.[24] After Godwin learned that the workers did not resume work at the jobsite, he checked GTE's bank account and saw three unknown transactions, which included the $106,387.58 payment that Lee intended for past due

---

[16] Trial Tr. Vol. I, 78:7-17.
[17] Stahl Aff. 2:8 (Doc. 111).
[18] Trial Tr. Vol. 2, 15:8-25 (Doc.187).
[19] Trial Tr. Vol. 2, 17:17-20.
[20] Trial Tr. Vol. 2, 18:1-4.
[21] Trial Tr. Vol. 2, 18:17-24.
[22] Trial Tr. Vol. 2, 19:7-9.
[23] Trial Tr. Vol. 2, 20:13-21:4.
[24] Defendant's Ex. 3 (Doc. 156-3); Stahl Aff. 2:9.

contributions to the benefit funds.[25] Due to Lee's unresponsiveness, Godwin believed that Lee was attempting to steal the $106,387.58.[26] Godwin completed a stop payment on the $106,387.58 transaction and transferred the funds to his personal Bank of America account.[27] Godwin testified that he did so to protect the money from Lee, as Lee had access to GTE's bank account.[28] On April 3, 2020, Godwin transferred $125,000 from his personal account with Bank of America to another personal account with Langley Federal Credit Union ("Langley"),[29] which Lee did not have access to.[30] The $125,000 would have included the aborted payment to IBEW Local 379's benefit funds. On April 8, 2020, the $125,000 was transferred out of the Langley account,[31] but the record is unclear as to where the money ended up following this transfer. Godwin estimates that approximately $25,000 of the money removed from GTE's account was used to pay off GTE's business debts.[32] Even so, the remaining $100,000 is unaccounted for.

Godwin testified that his concern and suspicion that Lee was stealing from GTE was based on various fuel reimbursement charges made to Lee that he believed were illegitimate.[33] Godwin testified that these reimbursements caused him concern for the following reasons:

> Because, number one, I knew that Global [GTE] paid for all the gas that went to his vehicles because we had a company card that paid for it. Number two, Lee and I had agreed that we would defer any payments to [ourselves] to make sure that business needs were done first.[34]

---

[25] Trial Tr. Vol. 2, 23:22-24.
[26] Trial Tr. Vo. 1, 176:7-11.
[27] Trial Tr. Vol. 2, 26:19-27:9.
[28] Trial Tr. Vol. 2, 27:6-9.
[29] Defendant's Ex. 6a (Doc. 156-6).
[30] Trial Tr. Vol. 2, 45:12-24.
[31] Trial Tr. Vol. 1, 229:3-12.
[32] Trial Tr. Vol. 2, 14:17-20.
[33] Trial Tr. Vol. 1, 180:3-8.
[34] Trial Tr. Vol. 1, 177:24-25 - 178:1-3.

Godwin pointed to approximately seven fuel reimbursements within the payroll records that led him to believe that Lee was using fuel reimbursements to take money out of GTE's account.[35] Further, Godwin learned through a vendor that Lee was using purchase orders to acquire tools for personal use.[36] Altogether, these circumstances heightened Godwin's suspicion of Lee, which led him to stop payment on the $106,387.58 and transfer that amount plus more from the GTE account.

### C. *Defendant's Communication with the Plaintiffs regarding IBEW Local 379's Benefit Funds*

Prior to and following the aborted $106,387.58 payment, Godwin communicated directly with Thrower regarding payment to the benefit funds on three occasions.[37] On the first occasion, Thrower testified that "Darmell had gotten married and was out of the country and would not return my calls. So[,] I called Calvin and that's one of the times they were behind [on payments to the benefit funds]. So[,] I had conversations with Calvin on the phone."[38] However, Thrower's testimony did not detail the substance of this conversation with Godwin.

The second occasion occurred on April 3, 2020, when Thrower called Godwin regarding the $106,387.58 owed to the benefit funds.[39] Thrower testified at trial that:

> Calvin told me that he believed Darmell was paying himself the $106,000 and that's why he stopped payment . . . [a]nd I informed him that, no, that was not money for Darmell, that was money for his employees and their insurance and retirement and to please return the money.[40]

Additionally, Godwin communicated with Thrower via email on April 10, 2020, regarding the amount owed to the benefit funds. Through email, Godwin advised Thrower that he believed Lee had stolen $151,272.02 via payroll, and that Lee was the "sole reason" why they were not

---

[35] Trial Tr. Vol. 1, 177:6 - 179:25.
[36] Trial Tr. Vol. 1, 181:15-21.
[37] Trial Tr. Vol. 1, 76:19-77:15.
[38] Trial Tr. Vol. 1, 68:14-18.
[39] Trial Tr. Vol. 1, 69:9-22.
[40] Trial Tr. Vol. 1, 69:9-14.

paid the union dues.[41]  On April 13, 2020, Thrower responded and asked what the chances would be of the benefit funds being paid.[42]  In response, Godwin advised Thrower:

> I'd suggest for you guys to reach out to Darmel in regards to an answer to that question as he's the one who took the monies that could've went to you guys and/or other vendors. He is also whom you guys have been dealing with in the past since he's part of the union. I'm sorry that I don't have an answer for you.[43]

Within their email correspondence and previous phone calls, Thrower did not directly inform Godwin of his fiduciary duty to the benefit funds or refer Godwin to the above quoted language of the Trust Agreement.

### D. Procedural History

On May 14, 2020, the United States District Court for the Middle District of Tennessee issued a Temporary Restraining Order prohibiting Godwin from disposing of "any or all" of the "Plaintiff funds'" assets in his possession.[44]  On May 28, 2020, after a hearing on the matter, the court converted the TRO into a Preliminary Injunction.[45]

On June 10, 2020, Godwin filed for relief in this Court under chapter 7 of the Bankruptcy Code, and the Plaintiffs thereafter timely commenced this adversary proceeding. The Plaintiffs allege that the $106,387.58 due them is a nondischargeable debt under § 523(a)(4), which provides that debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" are not dischargeable under bankruptcy.  The Plaintiffs' complaint was based on an allegation that the transfer of the $106,387.58 to them had been completed and that Godwin had "misappropriated" the funds by "clawing them back" from the Plaintiffs' accounts.[46]  The record showed otherwise; the transfer never made it to any of the

---

[41] Defendant's Ex. 9 (Doc.182-1).
[42] *Id*.
[43] *Id*.
[44] Plaintiffs' Compl., Ex. A, (Doc. 1) (admitted in Defendant's amended answer (Doc. 28).
[45] Plaintiffs' Compl., Ex. B (admitted in Defendant's amended answer).
[46] Plaintiffs' Compl. at ¶ 25.

Plaintiffs' accounts. At the summary judgment phase of this proceeding, the Court determined that the $106,387.58 never became an asset of the benefit funds due to the stop payment order, and thus Godwin was not acting as a fiduciary as to those funds when he obtained possession of that amount from GTE. The Plaintiffs appealed the summary judgment.

Important to this Court's summary disposition, the Plaintiffs' complaint does not clearly allege that under the Employee Retirement and Income Security Act (ERISA) and the CBAs, *all* income of GTE becomes subject to a fiduciary duty from day one of receipt, meaning the complaint's focus on the single alleged misappropriation via the claw-back is largely irrelevant. The complaint also does not allege the indicia to support that such fiduciary duty under ERISA law meets the test for a fiduciary under § 523(a)(4). But the district court on appeal, in considering the issue de novo—and noting a circuit split and acknowledging that the Eleventh Circuit had yet to apply the ERISA-deemed fiduciary to the capacity of a fiduciary under § 523(a)(4), reversed the summary judgment. The district court held that "the statutory trust created by [29 U.S.C.] § 1002(21)[47] has 'sufficient trust-like duties imposed on the trustee' necessary for Godwin to have been acting in a 'fiduciary capacity' under § 523(a)(4)."[48] In the district court's view, an ERISA-deemed fiduciary "narrowly passes the test" for § 523(a)(4) capacity.[49] The district court thus remanded for this Court to determine whether Godwin's actions in moving the funds to his personal account constituted defalcation under § 523(a)(4).

---

[47] Under ERISA, "a person is a fiduciary with respect to [an employee benefit] plan to the extent [that] he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets."
[48] *Thrower v. Godwin* (*In re Godwin*), 651 B.R. 392, 398 (M.D. Fla. 2023) (quoting *In re Forrest*, 47 F.4th 1229, 1241 (11th Cir. 2022)).
[49] *Id*. at 397.

## II. Legal Analysis

### A. *Overview of "Defalcation"*

Given the district's court's decision on appeal, Godwin cannot dispute that he is a fiduciary of the benefit funds within the meaning of § 523(a)(4). Rather, he disputes that he committed defalcation while acting in his fiduciary capacity. If Godwin committed defalcation when he stopped payment on the money owed to the benefit funds and transferred it to his personal account, or at some point afterward, the resulting debt is not dischargeable under § 523(a)(4).[50]

Defalcation refers to the failure to produce funds entrusted to a fiduciary.[51] Compared to embezzlement or misappropriation, defalcation is a broader term.[52] But, as the district court on appeal noted, defalcation requires an intentional state of mind.[53]

In *Bullock*, the Supreme Court settled that defalcation under § 523(a)(4) requires a "culpable state of mind" with "knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior."[54] The Court emphasized that even if a debtor's conduct does not involve bad faith or immoral conduct, the conduct giving rise to the debt must be intentional conduct.[55] The Court included within the scope of intentional conduct "not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as equivalent."[56]

---

[50] This Court has jurisdiction to hear and enter final judgment in this core proceeding arising under title 11 28 U.S.C. § 157(b)(1), (b)(2)(I).
[51] *Quaif v. Johnson*, 4 F.3d 950, 955 (11th Cir. 1993) (finding defalcation where a fiduciary intentionally transferred funds from a premium account to operating and payroll accounts).
[52] *Id.* at 955; *Timesharing Services, Inc. v. Johann* (*In re Johann*), 125 B.R. 679, 681 (Bankr. M.D. Fla. 1991).
[53] *Thrower v. Godwin*, 651 B.R. at 398-99.
[54] *Bullock*, 569 U.S. at 269.
[55] *Bullock*, 569 U.S. at 273.
[56] *Bullock*, 569 U.S. at 274.

Where actual knowledge of wrongdoing is lacking, the Court considers conduct as equivalent if the fiduciary consciously disregards or is willfully blind to a substantial and unjustifiable risk that his conduct will violate a fiduciary duty.[57] The risk must be of such a nature that "considering the nature and purpose of the actor's conduct and the circumstances known to him, [the fiduciary's] disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."[58] Willful blindness may be established where a debtor was "subjectively aware of the probable existence of a fact but[,] did not make any effort to determine if the fact exists."[59]

This opinion focuses on Godwin's state of mind at the time he stopped transfer on the payment, transferred the money to his personal account, and during his ensuing communications with the Plaintiffs. The timing of when Godwin became aware of his fiduciary duty and whether he could have surrendered the money to the benefit funds at that time is essential to determine whether Godwin acted with knowledge of the improper nature of his fiduciary behavior. Broader circumstances may be used to establish gross recklessness regarding the improper nature of his fiduciary behavior, as explained by the standard set forth in *Bullock*.

**B.** *Whether Godwin Acted with Knowledge of the Impropriety of his Fiduciary Behavior*

Imputing knowledge by another (such as perhaps Lee) of a fiduciary duty will not suffice to establish recklessness by Godwin under the standard set forth in *Bullock*.[60] As it is a

---

[57] *Id.*
[58] *Bullock*, 569 U.S. at 274.
[59] *Georgia Lottery Corp. v. Owens* (*Matter of Owens*), 599 B.R. 388, 394 (Bankr. N.D. Ga. 2019).
[60] *MacArthur Co. v. Cupit* (*In re Cupit*), 514 B.R. 42, 50 (Bankr. D. Colo. 2014) (discussing that the *Bullock* standard for defalcation relies heavily on the criminal law definition for recklessness found in the Model Penal Code. The test for criminal recklessness is subjective; therefore, liability for criminal recklessness requires a finding that the defendant disregarded a risk of harm of which he was aware).

11

subjective standard, the Plaintiffs must produce evidence that Godwin was aware of the fiduciary duty and of the risk that his conduct would violate that duty.[61]

For example, a Colorado bankruptcy court found that the subjective standard set forth in *Bullock* was met where a debtor was sued in an unrelated matter for a violation of his fiduciary duty, yet he continued conduct in violation of his fiduciary duty as he participated in the unrelated lawsuit.[62] The court found that the separate lawsuit effectively placed the debtor on notice of his fiduciary duty and the risk that his conduct would violate that duty.[63] Here, it appears that Godwin was not aware of his obligation to the benefit funds when he transferred the $106,387.58 to his personal account on March 30, 2020. It is true that Godwin signed the letter of assent to the CBA for IBEW Local 80. However, at the time Godwin completed the stop payment of the transfer to IBEW Local 379, and transferred the funds to his own account, there is insufficient (or, really, no) evidence to prove that he was aware of his fiduciary duty to make payments to the funds, the nature of GTE's assets as being in held in trust for IBEW Local 379, or how the payments were typically made.

Additionally, while Godwin was contacted by Thrower on April 3, 2020, regarding the money owed to the benefit funds, this differs from the Colorado case where a contemporaneous event took place that effectively placed the debtor on notice of his fiduciary duty, which the debtor then chose to ignore.[64] While Thrower's call with Godwin took place only a few days after the stop payment and transfer to his own account occurred, the conversation as relayed at trial was not precise enough to have placed Godwin on notice of his fiduciary duty. As Thrower testified at trial, during their call on April 3, 2020, Thrower merely informed Godwin "[t]hat

---

[61] *Id.* at 51.
[62] *Id.*
[63] *Id.*
[64] *Id.*

[the $106,387.58 payment] was not money for Darmell, that was money for his employees and their insurance and retirement and to please return the money."[65] Through later emails between Godwin and Thrower, Godwin directed Thrower to speak with Lee about the unpaid funds.[66] Thrower thanked him for the direction, and only asked for the bank statement that might reflect the payment to the benefit funds.[67] At no time during any of these conversations did Thrower clearly and directly state that Godwin owed a fiduciary duty to the benefit funds, or that GTE's funds were impressed with a trust benefitting IBEW Local 379. Altogether, these communications lack the necessary precision to have effectively placed Godwin on notice of his fiduciary duty like the lawsuit in the Colorado case.

To evidence a culpable state of mind, a debtor need not expressly admit that he was aware of a fiduciary duty, as his awareness may be inferred from the facts of the case, such as the knowledge and sophistication of the debtor.[68] Further, a debtor's knowledge and sophistication may be used to establish willful blindness.[69]

A bankruptcy court in Pennsylvania found that a debtor acted with conscious disregard or at least willful blindness due to his extensive knowledge and sophistication, which was demonstrated through twenty years of experience within the construction industry, experience drafting contracts, and his demonstrated understanding of the heavy regulation of the construction industry.[70] Regardless of his knowledge and experience, the debtor did not abide by requirements for contractors who received advance payments from property owners.[71] As a result, the court ruled that his knowledge and sophistication within the construction industry

---

[65] Trial Tr. Vol. 1, 69:9-14.
[66] Defendant's Ex. 9.
[67] *Id*.
[68] *DeWine v. Dudley* (*In re Dudley*), 582 B.R. 708 (Bankr. S.D. Ohio 2017).
[69] *Silvestri Homes WNY, LLC v. Jones* (*In re Jones*), 604 B.R. 443, 472 (Bankr. W.D. Pa. 2019).
[70] *Id.*
[71] *Id.*

demonstrated that he at least consciously disregarded or was willfully blind to the risk that his conduct would violate a fiduciary duty.[72] Unlike the debtor in the Pennsylvania case, Godwin did not have extensive experience directly related to the fiduciary duty at issue. Godwin's partner, Lee, was responsible for the day-to-day management of the business, including the payments made to the benefit funds; Godwin's role in GTE was limited to the procurement of new business opportunities, which included planning, estimating, and bidding construction contracts.[73] Godwin testified that "[b]ecause of my background, I chose to handle the business aspect, the pre-construction side, which was building relationships with GCs, vendors, getting those opportunities to bid in, and bidding that work."[74]

In an example of a court reaching the opposite result on different facts, a district court in Florida looked at the education, training, and obligations of a debtor to evaluate the nature and purpose of the debtor's conduct.[75] The debtor was an experienced attorney who entered into a fee agreement without explaining any alternatives or advising his client that such fees were not mandatory.[76] The debtor also admitted that he knew certain statutory provisions were not mandatory and that he had an ethical duty to minimize attorney's fees.[77] The district court affirmed the bankruptcy court's ruling that, as a trustee and legal professional, the debtor committed defalcation because, at the very least, he recklessly disregarded his duty of loyalty and candor.[78] However, as previously discussed, Godwin did not possess the relevant professional training or experience with respect to the benefit funds, statutory trusts, or

---

[72] *Id.*
[73] Trial Tr. Vol. 1, 160:22-25, 161, 162:2-4, 22-25.
[74] Trial Tr. Vol. 1, 161:10-13.
[75] *West v. Chrisman*, 518 B.R. 655, 665 (M.D. Fla. 2014) (affirming the Bankruptcy Court's ruling that the debtor committed defalcation due to reckless disregard of his duties of loyalty and candor, and gross and egregious deviation from the standard of conduct that a law-abiding fiduciary would observe).
[76] *Id.* at 664.
[77] *Id.* at 665.
[78] *Id.*

contracts with unions. As a result, his education, training, and obligations are not sufficient to prove that he had actual knowledge of his misconduct; rather, they ultimately reflect his inexperience with the benefit funds.

Moreover, the Court may rely on reasonable inferences to reach its findings and conclusions of law, and "[t]he standard for determining whether an inference is allowable is generally whether it is reasonable or whether it is one that reasonable and fair-minded men in the exercise of impartial judgment might draw from the evidence."[79] Given Godwin's lack of involvement or demonstrated expertise in the day-to-day management of GTE, the Court concludes that the Plaintiffs are not entitled to the inference that Godwin appreciated his fiduciary duty to the benefit funds based on his knowledge and sophistication.

Thus, the Plaintiffs have failed to prove that Godwin acted with actual knowledge of the improper nature of his fiduciary behavior.

### C. *Whether Godwin Acted with Gross Recklessness Regarding his Fiduciary Behavior*

Absent any actual knowledge of wrongdoing, the Plaintiffs must show the Debtor's conscious disregard or willful blindness to a substantial and unjustifiable risk that his conduct would violate a fiduciary duty.[80] A Massachusetts bankruptcy court found that such a culpable state of mind existed where a debtor was aware of his fiduciary duty to various funds, failed to remit assets owed to the funds, and instead prioritized payments to expenses that were favorable to himself, such as loans personally guaranteed by the debtor.[81] Unlike the Massachusetts case, where the debtor acted in his own interest, Godwin testified that he believed he protected GTE from theft at the time he transferred the money into his personal account.[82] Therefore, it seems

---

[79] *Ramaria Familienstiftung v. U.S.*, 643 F. Supp. 139, 147 (S.D. Fla. 1986) (internal citations omitted).
[80] *Bullock*, 569 U.S. at 274.
[81] *Raso v. Fahey* (*In re Fahey*), 494 B.R. 16, 22 (Bankr. D. Mass. 2013).
[82] Trial Tr. Vol. 2, 27:6-9.

Godwin intended for his actions to be in the best interest of GTE, rather than for his own personal benefit. Further, it is important to distinguish that Godwin, unlike the debtor in the Massachusetts case, disputes his awareness of his trust obligation to the benefit funds.

Another bankruptcy court, this one in New Jersey, found that a debtor with power of attorney over his father acted with gross recklessness when he cashed a check from his father's bank account after he became aware of his father's death and spent the money.[83] The court specifically pointed to the debtor's decision to spend the money after he became aware of his father's death as an act of gross recklessness sufficient to establish defalcation because the debtor should have been aware that his power of attorney ceased to exist upon his father's death.[84] While the circumstances here differ, this decision by the New Jersey bankruptcy court could support a finding that if Godwin had retained and spent the money after he became aware of his fiduciary duty, that awareness would amount to gross recklessness sufficient to establish defalcation. However, the Plaintiffs failed to present evidence that indicates Godwin was aware of his fiduciary duty at a time when he still retained any GTE-originated balance in his personal account. As previously discussed, the Plaintiffs' communications with Godwin were not sufficiently precise as to have alerted Godwin of his fiduciary duty. The Plaintiffs' conversations with Godwin are not unlike any other conversation GTE may have had with an ordinary creditor that requested payment as GTE juggled its debts.

Godwin eventually did learn of his fiduciary responsibility to the Plaintiffs. But it is unclear exactly when. It is also unclear if he still possessed any of the remaining $100,000 originating from GTE in his personal account with Langley at the time he became so aware. To be sure, Godwin should have understood the nature of his duty to the benefit funds at the latest

---

[83] *Estate of Patrick G. McCaffery v. McCaffery* (*In re McCaffery*), 2016 WL 7241377 (Bankr. D. N.J. 2016).
[84] *Id.*

16

when the District Court for Middle Tennessee issued its TRO prohibiting him from disposing of any of the Plaintiffs' trust assets in his possession. That TRO was issued on May 20, 2020.[85] As the Plaintiffs did not offer the bank statements for Godwin's Langley account at trial, the record is silent on whether he still had any balance of the GTE-originated funds in his account on that date. Had he, such sum would constitute a nondischargeable debt under § 523(a)(4).

Other bankruptcy courts have looked for evidence of bad faith, moral turpitude, or other immoral conduct to assess a debtor's failure to make payments in similar circumstances.[86] An Iowa bankruptcy court assessed the conduct of a debtor who desperately tried to keep his business afloat, communicated clearly with creditors, and prioritized his bills with plans to pay off all debts.[87] Based on the absence of bad faith or other immoral conduct, the court found that the debtor ultimately lacked the culpable state of mind required to establish defalcation.[88]

The Plaintiffs submitted an Eighth Circuit court decision as supplemental authority in response to the Court's request at trial to provide authority about the interplay between ERISA's fiduciary duties, 29 U.S.C. § 1104, and defalcation.[89] The Eighth Circuit distinguishes the facts of the Iowa bankruptcy court's decision from its own case, in which a debtor clearly prioritized payments in his own favor and did not communicate with the plaintiff regarding any payments owed.[90] While Godwin transferred money from GTE's business account to his personal account, the evidence suggests that Godwin believed that his actions were in the best interest of GTE. This is unlike the case before the Eighth Circuit, in which the debtor consciously

---

[85] Plaintiffs' Compl., Ex. A. ("Defendant Calvin Godwin is prohibited, either directly or indirectly, and whether alone or in concert with others, including any officer, agent, servant, employee, attorney, and/or representative of them, until further Order of this Court from disbursing, spending, moving, or transferring any or all of the $106,387.58 of Plaintiff fund assets in his possession.")
[86] *IBEW Local 231 v. Pottebaum* (*In re Pottebaum*), 2013 WL 5592368 (Bankr. N.D. Iowa 2013).
[87] *Id.*
[88] *Id.*
[89] *U.S. Dep't of Labor v. Harris* (*In re Harris*), 898 F.3d 834 (8th Cir. 2018).
[90] *Id.* at 846-847.

applied for his personal benefit at the outset.[91] While Godwin admits to previously paying himself from GTE's account, he testified that the payment caught him up on previously owed payroll, and occurred prior to the $106,387.58 payment.[92] However, at least $100,000 remains unaccounted for after it was transferred out of GTE's account to Godwin's personal account with Langley. Godwin testified that the remaining $100,000 was not used toward GTE's debts and remained in Godwin's personal account, from which he may have derived a personal benefit.[93] The probability that the funds were used for his own personal benefit is insufficient to establish defalcation because the Plaintiff has failed to prove that Godwin was both aware of his fiduciary duty and still had control over a balance of GTE-originated funds at the time he acquired that awareness, meaning before he disbursed the money from the Langley account, assuming it is now depleted.

At the time of Godwin's initial call with Lee on April 3, 2020, yes, he could have paid the money owed to the benefit funds, yet he transferred the money to his personal bank account with Langley and placed the blame on Lee. However, the Plaintiffs did not prove that Godwin was aware of his fiduciary duty at that time. Therefore, his actions were based on his understanding that the Plaintiffs were merely ordinary creditors that he could prioritize as the business needed. Based on these facts, Godwin's conduct is not as plainly egregious as the debtor in the Eighth Circuit case. Further, due to the absence of evidence to establish that he was aware of his fiduciary duty, Godwin's conduct likely aligns more closely with the conduct of the debtor in the Iowa case, in which the court heard no evidence that the debtor's failure to remit payment to the plaintiff involved bad faith or immoral conduct.[94]

---

[91] *Id.*
[92] Trial Tr. Vol. 2, 16:10-18.
[93] Trial Tr. Vol. 2, 14:17-22.
[94] *In re Pottebaum,* 2013 WL at *6.

To establish defalcation, a plaintiff may also show that the risk of breaching a fiduciary duty was so obvious that the defendant must have recognized the risk, but went forward nonetheless in such a way that his conduct constituted a gross deviation of the standard of conduct expected in his fiduciary role.[95] A Georgia bankruptcy court found that such a gross deviation occurred where an owner and sole proprietor of a truck stop and convenience store abandoned his responsibilities under a retailer contract to sell lottery tickets, and left another employee in charge of the operation.[96] The retailer contract and a statute imposed a fiduciary duty on the owner; however, the employee left in charge did not possess that same fiduciary duty.[97] The court found that the defendant's conduct was a "complete abandonment of his fiduciary duty."[98] Unlike the defendant in the Georgia case, Godwin did not knowingly abandon his fiduciary duty. The management of GTE was split between Godwin and Lee, and payment to the benefit funds typically fell within Lee's responsibilities in the day-to-day management of GTE.[99] Based on their division of work, there is no indication that Godwin's conduct amounted to abandonment of his fiduciary duty such that he grossly deviated from the standard of conduct expected in his role as a fiduciary.

### III. Conclusion

The Plaintiffs' failure to present sufficient evidence demonstrating that it is more likely than not that Godwin acted knowingly or with gross recklessness regarding his fiduciary behavior leaves the evidence in equilibrium concerning defalcation. That means the record leaves the trier of fact with mere speculation that Godwin still had control of benefit funds when he finally understood his fiduciary duty. On the other hand, it is equally plausible that he no

---

[95] *Matter of Owens,* 599 B.R. at 394.
[96] *Id.*
[97] *Id.*
[98] *Id.* at 396.
[99] Trial Tr. Vol.1, 162:2-9.

19

longer had control of benefit funds once he learned of his duty. The burden of proof requires more than equal plausibility. As previously discussed, such a "tie" between the parties in litigation leads to a loss to the bearer of the burden of proof. Based on the foregoing, the Court finds and concludes that, with respect to the $106,387.58 payment owed to the Plaintiffs' benefit funds, Godwin did not commit defalcation because there is insufficient proof he had the culpable state of mind required by *Bullock*. Thus, the $106,387.58 debt is not excepted from his discharge under § 523(a)(4). The Court will enter a separate final judgment in the Defendant's favor.